UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| YVONNE L. DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-01918-JRO-MJD |
| | ) | |
| MARION COUNTY SUPERIOR COURT JUVENILE DETENTION CENTER, PAIGE BOVA KERVAN, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Yvonne L. Davis was the Director of Staff and Youth Services for Defendant Marion County Superior Court Juvenile Detention Center ("JDC"). JDC terminated her employment in 2022 and then refused to rehire her when she reapplied for the same position ten months later. Davis alleges that JDC discriminated against her on the basis of sex in its rehiring decision, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* JDC moves for summary judgment. The motion, dkt. [99], is **GRANTED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Because JDC has moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

Davis, a woman, worked at JDC from 2000 to 2022. Dkt. 15 ¶ 12. For the last six of her twenty-two years of employment at JDC, she was the Director of

Staff and Youth Services ("DSYS"). Dkt. 120 at 5. Davis reported to Kelvin Burrell, JDC Assistant Superintendent, who in turn reported to Mary Dozier, JDC's Superintendent, who in turn reported to Defendant Paige Bova Kervan, JDC's Chief Operating Officer. Dkt. 15 at 3, 5. Kervan held the role of the highest Human Resource official in the Marion Superior Court. Dkt. 121 at 2.

**A. Davis's Report to Kervan**

Davis's termination followed her involvement in reporting rumors that JDC administrators Burrell and Dozier were seen together outside of work at a local casino. Kaila Butler, one of Davis's subordinates, reported to Davis that she saw the two administrators sitting closely together and abruptly leaving after they saw Butler. Dkt. 120 at 19. Butler memorialized what she remembered in a Matter of Record ("MOR"), using a JDC incident report, dkt. 99-4 at 6, and gave it to Davis. Butler could not identify the pair she saw by name but pointed to where their offices were in the JDC. *Id.* at 2. Davis determined that the pair was Burrell and Dozier. Dkt. 113-17 at 2.

Davis then sent Butler's MOR to Kervan. Dkt. 113-17 at 3. Two days later, Kervan responded to Davis's email and accompanying MOR, and asked "[a]m I missing something? It says two employees from administration were at the casino. It doesn't say who they were, or if they were doing something inappropriate." Dkt. 99-4 at 3. Kervan asked if Davis knew who the two administrators were; Davis said she did not know. *Id.* at 2. Meanwhile, Dozier and Burrell were informed by a third-party of the MOR Davis had sent to Kervan.

## B. Davis's Termination

Dozier, with Kervan's support, decided to terminate Davis's employment. Dozier drafted a Corrective Action Report ("CAR") detailing why termination was appropriate. Dkt. 99-3. Davis was given the CAR, which stated in part that she violated Marion County court policies because of poor work performance, insubordination, dishonesty or discourtesy, and "[i]mmoral, unprofessional or disruptive behavior while on duty." *Id.* at 2. One alleged example was "a pattern of [Davis] disregarding directives that [Dozier] would give." *Id.*

The CAR detailed that Davis met with Burrell after Davis sent the MOR to Kervan. During that meeting, Davis told Burnell that she would misleadingly represent that the administrator in the casino was Alex Murdock instead of Burrell, despite knowing that it was Burrell. *Id.* at 4. The CAR also described a separate incident involving Davis that occurred in March of 2022. *Id.* At that time, Kervan, Dozier, and Burrell met with Davis to "discuss concerns regarding inappropriate comments [Davis] had made about a new hire for Administration to other employees, as well as other comments of concern that had been reported." *Id.* That meeting centered around the need for Administration staff to "be able to trust one another" and how "trust is essential to a cohesive work environment." *Id.* The CAR concluded by describing how Davis's actions "have irreparably harmed the trust and confidence that an employer can reasonably expect from its employees, particularly those in a leadership role." *Id.* Davis denied the allegations in the CAR and disputes the events of March and September 2022. But she does not allege wrongful discharge or retaliation here.

Davis was officially terminated on September 26, 2022. *Id.* at 2. On January 27, 2023, Davis filed a six-count complaint alleging various federal and state claims against Kervan, Dozier, and another JDC employee related to her termination. 1:23-cv-00172-RLY-TAB ("*Davis I*"); *see* Dkt. 99-1. The Court granted Defendants' motion for summary judgment in part, granting judgment as a matter of law as to all federal claims, and then declining jurisdiction over the three remaining state claims, dkt. 99-2 at 17, which remain pending in state court under cause number 49D04-2508-CT-039924.

**C. Davis's Application for Rehire**

In July 2023, JDC solicited applications for Davis's old position, Director of Staff and Youth Services. Dkt. 99-6 at 1–3; Dkt. 113-15. The listed qualifications for the job, dkt. 99-6, included a Bachelor's degree and a minimum of three years of proven supervisory experience. *Id.* at 2. Consideration would also be given to a "non-degree candidate (in lieu of Bachelor's degree) with at least three years of detailed supervisory experience and proven knowledge of the Detention Center's organizational and security structure, confidentiality needs, and safety/security procedures & policies." *Id.* Further, the position called for a candidate to "be able to multi- task, use time effectively, accept supervision and constructive feedback, make sound judgment calls /decisions in emergency situations" and to have the "[a]bility to work within a culturally diverse environment." *Id.*

Davis applied for the job in July 2023. Dkt. 113-10 at 3.

### D. Defendants Do Not Rehire Davis

Davis was not rehired. It is undisputed that Davis satisfied the listed qualifications for the DSYS position. Dkt. 121 at 19. It is also undisputed that JDC did not seriously consider her for the position. Dkt. 118 at 7–8; Dkt. 120 at 5. For instance, Burrell stated that Davis was qualified for the position when she applied, dkt. 113-6 at 48, but also stated that he would not have interviewed Davis again for the position after speaking with his team, *id.* at 49. Burell described Davis as "vengeful," dkt. 99-7 at 50, and also stated that when looking for prospective employees, they look to "see if they are a good match" with the current team in place, *id.* at 62, 65, 67. Burrell stated that he would not have considered giving Davis an interview because he believed she damaged working relationships within the JDC with her divisive and disruptive behavior. *Id.* at 67.

While the parties dispute some of the other details, it is undisputed that Davis was deemed ineligible for rehire based on the informal policy of not rehiring employees who had been terminated within one year. Dkt. 118 at 7–8; Dkt. 120 at 13. Kervan had the authority to determine whether somebody who had been fired was eligible for rehire. Dkt. 99-5 at 26–27; Dkt. 120 at 4. It is also undisputed that Davis was terminated within a year of reapplying, in September of 2022, and the reasons for the termination were detailed in the CAR. Dkt. 118 at 3; Dkt. 120 at 5.

Davis questions the credibility of this evidence but does not dispute the explanation of her September 2022 termination. While she argues that the testimony of Kervan and Burrell is inconsistent with JDC's response to Davis's

EEOC complaint, the inconsistencies are overstated. The facts about Kervan's and Burrell's position on not rehiring Davis are not in dispute.

### E. Defendants Promote King

Instead of hiring Davis, JDC promoted an internal candidate, Godwin King, a male, as the DSYS. Dkt. 113-10 at 3–4. King "had zero years prior experience as DSYS" and less than one year total at JDC when he was promoted. Dkt. 120 at 6. He had previously "been convicted of a felony, stealing over $15,000 from a group home resident, but was punished at the misdemeanor level as part of his plea agreement." *Id.* at 5. Kervan was aware of this conviction but hired and promoted him anyway. *Id.* King also lied on his job application for the DSYS position that he had a college degree in order to receive a salary increase. *Id.* at 6. Kervan did not discipline him.

### F. Procedural History

On October 3, 2023, Davis filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), Charge No. 470-2024-00044, alleging sex discrimination under Title VII of the Civil Rights Act of 1964. Dkt. 15 ¶ 4. On August 15–16, 2024, Davis received the EEOC's right to sue letter and timely filed this action on October 30, 2024. *Id.* ¶ 6; *see also* dkt. 1.

Davis alleged sex discrimination under Title VII against JDC for failing to rehire her as the DSYS and First Amendment retaliation against Kervan for failing to rehire her after she filed the *Davis I* lawsuit. Dkt. 1.

On November 3, 2025, Defendants moved for summary judgment. Dkt. 99. In her response to the motion, Davis abandoned her First Amendment retaliation

claim because the alleged retaliation was not in response to her speech as "a private citizen speaking out on a matter of public concern." Dkt. 120 at 2 (citing *Zorzi v. Cnty. of Putnam*, 30 F.3d 885, 896 (7th Cir. 1994)). Davis confirms that "only her Title VII sex discrimination claim against Defendant [JDC]" remains. *Id.* Based on this concession, the Court **GRANTS** Defendants' motion on the First Amendment retaliation claim. The remaining claim against JDC for Title VII sex discrimination matter is now ripe for decision.

## II. LEGAL STANDARD

A district court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l*

*Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). While the Court will "construe all facts and draw all reasonable inferences in the nonmoving party's favor," the moving party may prevail at summary judgment "'by showing an absence of evidence to support the nonmoving party's claims.'" *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (quoting *Tyburski v. City of Chicago*, 964 F.3d 590, 597 (7th Cir. 2020)).

**III. DISCUSSION**

Title VII forbids an employer from discriminating against any individual with respect to his or her "compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The legal standard in a Title VII case is holistic: "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Burton v. Will Cnty. Sheriff's Merit Comm'n*, 176 F.4th 544, 548 (7th Cir. 2026) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). The burden-shifting approach in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), is "one way of culling the relevant evidence" to answer this question. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) ("[T]he well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases.").

Davis relies primarily on *Ortiz* to present her claim. But JDC's motion is organized around the *McDonnell Douglas* framework. So the Court will use that

approach first and circle back to *Ortiz* for good measure. *See Tyburski*, 964 F.3d at 599 ("As long as the court considers the evidence as a whole, it may also use the *McDonnell Douglas* framework as a supplemental tool."). Under either framework, the undisputed evidence considered as a whole shows that JDC is entitled to summary judgment.[1]

**A. *McDonnell Douglas* Burden-Shifting Approach**

Under the *McDonnell Douglas* framework, to make out a prima facie case of discrimination in the failure-to-hire context, a plaintiff must establish that: (1) she was a member of a protected class; (2) she was qualified for and applied to an open position; (3) she was rejected; and (4) the employer filled the position by hiring someone outside the protected class, or left the position open. *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 412 (7th Cir. 2018) (citing *Blise v. Antaramian*, 409 F.3d 861, 866 (7th Cir. 2005)).

If a plaintiff establishes a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802. If the employer can articulate such a reason, the burden then shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual. *Igasaki v. Illinois*

[1] The Court acknowledges that the Parties spent much time briefing the admissibility of evidence. Dkt. 121 at 6–11; Dkt. 123 at 2–16. Evidentiary issues aside, assuming all of Davis's evidence and allegations are admissible, it still does not demonstrate that her sex played any part in JDC's decision not to rehire her. No reasonable jury could find that JDC discriminated against Davis on the basis of her sex under either *McDonnell Douglas* or *Ortiz*.

*Dep't of Fin. & Prof. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020)).

**1. *Prima facie* showing under *McDonnell Douglas* is satisfied**

At this stage, there is no dispute that the first, third, and fourth prongs are met. Davis is a woman and thus a member of a protected class. She was rejected for the DSYS position in 2023 while Godwin King, male, was instead selected. Dkt. 118 at 14. As to the second prong, JDC argues that Davis was not qualified for the position because it sought an internal candidate and because of an alleged informal policy of not rehiring employees who had been fired in the past year. Dkt. 121 at 19. JDC, however, concedes that Davis was "qualifi[ed] on paper." *Id.* Viewing the facts in a light most favorable to Davis, a reasonable fact finder could determine that she was qualified for the position. She had over twenty years of experience with JDC and over six years of experience in the same role she sought. Her *prima facie* showing is therefore met.

**2. Legitimate nondiscriminatory reason**

JDC proffers a legitimate nondiscriminatory reason for not rehiring Davis. At this stage, JDC "only has to produce admissible evidence that would permit a rational jury to conclude that the employment decision had not been motivated by discriminatory animus." *Stockwell v. City of Harvey*, 597 F.3d 895, 903 (7th Cir. 2010). This is a light burden. *Id.* (citing *Pilditch v. Bd. of Educ. of City of Chicago*, 3 F.3d 1113, 1117 (7th Cir. 1993)). Reasons for not rehiring can be subjective. So long as JDC points to "reasonably specific facts that explain how it formed its opinion," it has met its burden. *Oliver*, 893 F.3d at 413 (quoting *U.S.*

*E.E.O.C. v. Target Corp.*, 460 F.3d 946, 957 (7th Cir. 2006) (describing the employer's burden when it relies on subjective reasons for not hiring)). Here, this standard is easily satisfied.

Only ten months had passed between that CAR and when Davis applied for her old position. JDC maintains that Davis was not rehired because of her recent termination, her disruptive behavior, and the trust issues that emerged as a result. Dkt. 118 at 17–18. JDC notes it had "more insights into Plaintiff's soft skills and interpersonal dynamics" and determined that she was not a good fit at the time of her application. *Id.* at 18. In the CAR, JDC identified Davis's violations of Marion County Court Policies because of poor work performance, insubordination, dishonesty, and disruptive behavior. *Id.* at 3, 14.

JDC's explanation passes muster. In essence, JDC argues that it decided not to rehire Davis for the same reasons it terminated her in the first place. The record shows there was a breakdown in trust between Davis and JDC. A reasonable jury could find that the nondiscriminatory factors that drove Davis's termination similarly drove JDC's decision not to rehire her. *See Burton v. Will Cnty. Sheriff's Merit Comm'n*, 176 F.4th 544, 548 (7th Cir. 2026) (a negative employment reference is unquestionably a legitimate, nondiscriminatory reason for failure to hire). The burden now shifts back to Davis to show pretext.

**3. Pretext**

Once the employer has articulated a legitimate, nondiscriminatory reason for its decision, the presumption of discrimination falls away. *Cianci v. Pettibone Corp.*, 152 F.3d 723, 726 (7th Cir. 1998). The plaintiff then has the burden of

producing sufficient evidence to show that the proffered reason is a pretext for discrimination. *Id.*; *see McDonnell Douglas*, 411 U.S. at 802, 804.

Pretext means "a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). The question is not whether the employer's explanation for its employment decision was "accurate, wise, or well-considered," but whether the employer's explanation was "honest." *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) (quoting *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000)). Put differently, an otherwise legitimate, non-discriminatory hiring rationale is pretextual if the hiring manager did not "sincerely believe[]" the rationale when making his final decision. *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1015 (7th Cir. 2004). "Pretext can be proven, among other ways, by evidence (1) that the employer's explanation has no basis in fact; (2) of ambiguous or suggestive comments or conduct; or (3) of better treatment of people similarly situated but for the protected characteristic." *Paterakos v. City of Chicago*, 147 F.4th 787, 797 (7th Cir. 2025) (cleaned up).

Importantly, "a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext *for the prohibited animus*." *Hitchcock v. Angel Corps., Inc.*, 718 F.3d 733, 740 (7th Cir. 2013) (emphasis added). A plaintiff can demonstrate that the employer's explanations are pretextual either directly, by showing that "a discriminatory reason more likely motivated" the employer's actions, or indirectly, by showing that the employer's explanations are "unworthy of credence." *Senske v. Sybase, Inc.*, 588 F.3d 501,

507 (7th Cir. 2009). To show that the employer's non-discriminatory explanations are not credible, the plaintiff must point to evidence that the employer's stated reasons are not the real reasons for the employer's action, have no grounding in fact, or are insufficient to warrant the employer's decision. *Id.*; *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007) (noting that a plaintiff must identify such "weaknesses, implausibilities, inconsistencies, or contradictions" in the employer's asserted reasons that a reasonable person could find them not credible). "Pretext does not exist if the decisionmaker honestly believed the nondiscriminatory reason given by an employer for an adverse employment action." *Downing v. Abbott Lab'ys*, 48 F.4th 793, 804–05 (7th Cir. 2022) (cleaned up).

At bottom, Davis must "demonstrat[e] by a preponderance of evidence that the stated reasons for her [not being rehired] were false, not that they were unfair or baseless." *Anderson v. Street*, 104 F.4th 646, 653 (7th Cir. 2024).

To show pretext, Davis points to Alex Murdock as an example of a similarly situated male who was treated more favorably. Davis then points to an alleged pattern of males being treated more favorably than females by JDC. She also notes that Kervan's informal policy of not rehiring within a year of termination was selectively enforced and provides examples using comparators. *See Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018) ("[C]omparator evidence and selective enforcement of an employer's rules are relevant" to a pretext analysis.). Lastly, Davis argues that a reasonable jury could choose to believe that JDC's "shifting explanations" evince pretext. Dkt. 120 at 17. The Court takes each in

turn and ultimately finds Davis fails to show JDC's reasons for not hiring her were pretextual.

**a. Male comparator**

"When using comparators to demonstrate pretext, a plaintiff must usually 'show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Napier v. Orchard Sch. Found.*, 137 F.4th 884, 894 (7th Cir. 2025), *cert. denied*, 146 S. Ct. 328 (2025) (cleaned up) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)).

The purpose of the "similarly situated inquiry is to eliminate other possible explanatory variables, . . . [to] isolate the critical independent variable—discriminatory animus." *Mitchell v. Exxon Mobil Corp.*, 143 F.4th 800, 810 (7th Cir. 2025) (alterations in original) (quoting *Smith v. City of Janesville*, 40 F.4th 816, 823 (7th Cir. 2022)). In other words, the plaintiff must establish that "the purported comparator was 'directly comparable to her in all material respects' so as to 'eliminate other possible explanatory variables.'" *Id.* (quoting Gamble v. Cnty. of Cook, 106 F.4th 622, 626 (7th Cir. 2024)).

Alex Murdock, a male, is Davis's proffered comparator. Dkt. 113-10 at 4; Dkt. 120 at 8. JDC employed Murdock from 2015 to 2017. After receiving two CARs, he was eventually terminated in 2017, dkt. 120 at 4–5; dkt. 113-10 at 3, for poor work performance, insubordination or failure to follow instruction, and neglect or failure to perform assigned duties, dkt. 113-13 at 5; dkt. 120 at 8; dkt.

121 at 18. In March 2022, more than four years after he was fired, JDC hired Murdock as the second shift DSYS. Dkt. 120 at 5; Dkt. 113-10 at 3.

Davis argues Murdock is similarly situated because both Murdock and Davis were involuntarily terminated by Kervan, but only Murdock was rehired. Dkt. 120 at 5; Dkt. 123 at 4. Davis maintains that a reasonable juror could find that JDC's stated excuse for rehiring Murdock but not Davis is contrived and suspicious and thus merely a pretext for the real basis for their different treatment: sex discrimination. Dkt. 120 at 10, 12. JDC disagrees, arguing that Murdock and Davis are not similarly situated because Murdock had been terminated more than four years prior to his rehiring. Dkt. 118 at 16.

The Court agrees with JDC that Davis and Murdock are not similarly situated. Similarly situated individuals must be similarly situated in all material respects in order to "eliminate other possible explanatory variables." *Mitchell*, 143 F.4th at 810. Moreover, they must be subject to the same standards when being considered for rehiring.

Davis was fired and then applied for her same position ten months later. Conversely, Murdock was fired and was rehired more than four years later. That four-year difference matters. Ten months is an insufficient time for the dust to settle after a termination based on divisive behavior. A more than four-year gap is a different story. What's more, nowhere in the record does it show that Murdock engaged in divisive behavior that alienated himself from his peers. These "other possible explanatory variables" explain the different treatment JDC gave to Davis and Murdock, *Mitchell*, 143 F.4th at 810, not sex discrimination.

**b. Allegations that JDC treated men more favorably**

Davis offers examples of current or former employees of JDC that Kervan treated more favorably, thus giving rise to the inference of pretext. Dkt. 120 at 17–22. Davis again proffers Murdock but also discusses Godwin King (the internal candidate who ultimately got the job Davis applied for), and Asante Doyle as males that purportedly received better treatment. *Id.* at 17–18. She then proffers evidence involving circumstances with Burrell, Serena Thompson, Makayla Granson, Christopher Sutton, and James Snider, which the Court will discuss below. Defendants object to the admissibility of many of these facts and decries the "scattershot approach" taken by Davis. Dkt. 121 at 1. Assuming without deciding that the evidence is admissible, it does not change the outcome because it has more to do with her September 2022 termination, not JDC's decision not to rehire her in 2023.

As to Burrell, Davis alleges that he sexually harassed two female employees that were fired after they complained about it. Dkt. 120 at 7. Burrell was also "suspected of engaging in food stamp fraud." *Id.* at 6. Despite this, Kervan "took no action against" him. *Id.* As to Doyle, Davis alleges that Kervan "overlooked" Doyle's month-long absence from work, *id.* at 22, and also alleges that King stole more than $15,000 from a resident of a group home and lied on his job application about having a four-year college degree, *id.* at 24. "Kervan's tolerance of two male's more egregious acts of dishonesty" makes JDC's attempt to point to Davis's dishonesty as the reason for not rehiring her "disingenuous." *Id.* Davis thus believes she has "produced enough evidence to show she was

treated differently than males who had committed more serious offenses and were either not disciplined or were retained in their employment with JDC, whereas she was denied rehire." *Id.* at 25.

With this evidence, Davis is attempting to relitigate her September 2022 termination, which is not at issue here. The undisputed facts show that Davis was terminated after the September 2022 incident. While Davis disputes the veracity of the reasons given for her termination, dkt. 120 at 8, it is undisputed that the reasons were given and are detailed in the CAR. JDC's legitimate nondiscriminatory reason for not rehiring Davis was that she was recently terminated and thus was not considered for rehire. None of the above evidence gives rise to an inference that JDC, when it decided not to rehire Davis, did so because of her sex.

**c. Kervan's selective enforcement of JDC's informal rehiring policy**

Davis argues that JDC's informal policy of not rehiring individuals fired less than one year previously is simply "false." Dkt. 120 at 9. Davis points to three examples of employees that she alleges were fired but then rehired within one year: Makalya Granson (female), Serena Thompson (female), and Christopher Sutton (male). Dkt. 113-20 at 3.

Davis contends that Granson was fired and rehired by Kervan less than a year later. *Id.* JDC disputes this and maintains that Granson was not rehired within one year of termination and instead was rehired more than two years after she was terminated. Dkt. 121 at 4.

Davis says that Thompson threatened to run over another employee, was allowed to resign in lieu of termination, yet was rehired by Kervan a few weeks later. Dkt. 113-20 at 3. JDC disputes this and argues that Thompson voluntarily resigned from her position in March 2017 and was rehired in September 2018. Dkt. 121 at 3.

Davis then points to Sutton, who was fired for attendance issues in August of 2022, but rehired mere months later in November of 2022. Dkt. 113-20 at 3; Dkt. 121 at 12. JDC concedes Sutton as an "exception" to JDC's informal rule, and notes that his original termination was because of attendance issues and not for misconduct or interpersonal problems. Dkt. 121 at 12. JDC further argues that Sutton was demoted to an entry level position upon his return, and thus the job he was rehired for was a different position from the one he was fired from. *Id.*

As to Granson and Thompson, these factual disputes are immaterial. Thompson and Granson are both women. Assuming the facts in a light most favorable to Davis and that these employees were rehired less than a year after their termination, this evidence shows JDC made exceptions to its one-year rehire policy in favor of women. It is not evidence the one-year policy is a sham to cover up JDC's refusal to rehire Davis because she was a woman.

As to Sutton, no reasonable jury could infer pretext based on the undisputed facts. There is a material difference between Sutton and Davis. Sutton returned to JDC in an entry level position, a demotion from the position he was terminated from. In contrast, Davis applied for a supervisory position—

the same position she was fired from. No reasonable jury could find that JDC discriminated against Davis on the basis of her sex because it effectively demoted Sutton but did not rehire Davis for her supervisory position.

Finally, Davis also provides a declaration by James Snider, who was employed by JDC from 2014–2021 and was Kervan's subordinate. Dkt. 113-19. This affidavit does not establish pretext. Snider "had extensive dealings with Kervan and observed that she had a pattern of treating male employees more favorably than female employees." Dkt. 120 at 10. Specifically, Snider claims that Kervan "favored black males over black females." Dkt. 113-19 ¶ 21. But the rehiring of Granson and Thompson suggest otherwise. Moreover, Snider's affidavit also details an example of a female employee who committed a number of terminable offenses who received favorable treatment from Kervan. Dkt. 113-19 ¶ 28–30. In other words, Snider's affidavit establishes that Kervan's preferences, not sex discrimination, explains who is hired, fired, and rehired at JDC: "If [Kervan] liked you, she took care of you, if she didn’t like you, she would discipline or terminate you." Dkt. 113-19 ¶ 27. This is fundamentally inconsistent with Davis's argument that the one-year rehiring policy was a pretext for sex discrimination.

**d. Shifting explanations**

Davis's final argument for pretext is JDC's "shifting explanations" for not rehiring her. Dkt. 120 at 17. JDC informed the EEOC that Davis was "not qualified" for the position. Dkt. 113-14 at 7. But now JDC argues that while Davis was qualified "on paper," "the facts surrounding [Davis's] termination

made her unqualified for the DSYS position in August 2023." Dkt. 121 at 19. Davis seizes on this inconsistency as proof that JDC's so-called practice of "deeming former employees who had been fired a lengthier time ago as eligible for rehire but not those employees who had been fired more recently" is "implausible on its face and may be disbelieved by a jury." Dkt. 120 at 13.

This argument overstates JDC's inconsistent reasoning. While an employer's shifting factual accounts and explanations for adverse employment action "can often support a reasonable inference" of pretext, *Donley v. Stryker Sales Corp.*, 906 F.3d 635, 638 (7th Cir. 2018), it is also true that "[m]erely providing multiple, or additional, reasons for an adverse employment decision does not establish pretext." *Saud v. DePaul Univ.*, 154 F.4th 563, 569 (7th Cir. 2025). "[T]o give rise to pretext, 'explanations must actually be shifting and inconsistent.'" *Id.* (quoting *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 881 (7th Cir. 2016)).

At bottom, JDC's explanations for not rehiring a recently fired Davis are not inconsistent with one another. They all center around Davis's recent termination, the reasons for that departure, and JDC's and/or Kervan's general lack of desire to rehire her. So long as an employer "honestly believed it made the correct employment decision—even if its decision was inaccurate, unfair, foolish, trivial, or baseless—[the] claims cannot succeed." *Barnes-Staples v. Carnahan*, 88 F.4th 712, 716 (7th Cir. 2023) (cleaned up); *Upchurch v. Indiana*, 146 F.4th 579, 587 (7th Cir. 2025)*; see also Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013) ("[W]e evaluate the honesty of the employer's explanation,

rather than its validity or reasonableness . . . ."). And it is not enough that JDC offered different explanations in the EEOC charge and in depositions. *See Saud*, 154 F.4th at 569 ("'Where an employer relies on multiple reasons for the termination, its failure to address *all* of the reasons in *each* communication about the employee is not enough to show contradictions or shifts in rationales that suggest pretext.'" (emphasis in original) (quoting *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 577 (7th Cir. 2015)). On this record, no reasonable jury could find that JDC's legitimate nondiscriminatory reasons for not rehiring Davis were pretext for sex discrimination.

* * *

In sum, no reasonable jury could find under the *McDonnell Douglas* framework that JDC discriminated against Davis based on her sex when it decided not to rehire her.

***B. Ortiz's* Holistic Approach**

Davis's claim fares no better under *Ortiz*. Davis points to the "pile of evidence," dkt. 120 at 8–11, largely stated above, and argues it demonstrates a triable issue of fact for a jury to infer pretext and thus precludes summary judgment. The Court disagrees.

The undisputed facts show Davis was terminated in September of 2022 because JDC lost trust in her due to her disruptive and divisive behavior and failure to follow JDC policy. Yet she applied for the same position less than one year later. JDC chose not to hire her for the same reasons it terminated her.

The record lacks evidence to support a finding that Davis's sex had anything to do with the decision. Even assuming the selective enforcement of the one-year rehiring policy, Davis's own evidence shows that JDC's decision not to rehire Davis was based on the favoritism exhibited by Kervan for certain employees over others. Dkt. 113-19 ¶ 27. But favoritism and dysfunction are not actionable under Title VII. *See Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) ("[A]n employer's decision to favor one candidate over another can be mistaken, ill-considered or foolish, but so long as the employer honestly believed those reasons, pretext has not been shown." (cleaned up)). As JDC puts it, "[Davis] was no longer a good fit in September 2022, and nothing demonstrably changed between then and July 31, 2023 . . . ." Dkt. 118 at 15. So long as an employer "honestly believed it made the correct employment decision—even if its decision was inaccurate, unfair, foolish, trivial, or baseless—[the] claims cannot succeed." *Barnes-Staples*, 88 F.4th at 716 (cleaned up); *Upchurch*, 146 F.4th at 587; *see cf.*, *Napier,* 137 F.4th at 895–96 ("No reasonable fact-finder could determine that [the plaintiff's filing of] litigation, rather than the events that led to his termination, was the 'but-for' cause of [the employer's] decision not to rehire him" where plaintiff was terminated because employer "no longer trusted him.").

In the end, under *Ortiz's* holistic inquiry, no reasonable jury would dispute that the circumstances of Davis's termination, not sex-based animus, drove JDC's decision not to rehire her.

## IV. CONCLUSION

The undisputed evidence shows that JDC did not refuse to rehire Davis because of her sex. And Davis has abandoned her First Amendment retaliation claim against JDC and Kervan. Accordingly, Defendants' Motion for Summary Judgment, dkt. [99], is **GRANTED**. Final judgment shall now issue by separate entry.

**SO ORDERED.**

Date: 9/28/2026

Justin R. Olson
United States District Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email